**Michael Pijanowski, OSB #004426**
mpijanowski@oregonlawcenter.org
**Leslea Smith, OSB #853324**
lsmith@oregonlawcenter.org
**Spencer Neal, OSB #772860**
mneal@oregonlawcenter.org
**Edward Johnson, OSB #965737**
ejohnson@oregonlawcenter.org
OREGON LAW CENTER
230 NE Second Ave, Suite F
Hillsboro, OR 97124
Phone: (503) 640-4115
Fax: (503) 640-9634

Of Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| TRINKA A. TURNER,<br>JUNEA R. MURPHY, and<br>JENNIFER L. JUNKINS, on behalf of<br>themselves and all other similarly<br>situated, | Case No. 3:13-cv-01900-SI<br><br>PLAINTIFFS' REPLY |
|           Plaintiffs, | |
| v. | |
| THOMAS VILSACK, Secretary of the<br>Department of Agriculture;<br>DOUGLAS O'BRIEN, Acting<br>Undersecretary for Rural Development;<br>RICHARD DAVIS, Acting<br>Administrator Rural Housing Service;<br>and VICKI L. WALKER, Oregon RD<br>State Director,<br>          Defendants. | |

Page 1 – PLAINTIFFS' REPLY

## INTRODUCTION

Plaintiffs are unable to respond to or verify many of Defendants' assertions regarding attempts to sell Jandina and retain it as subsidized housing and the methods they used in determining suitability, obsolescence and economic viability because Defendants have refused Plaintiffs' request to provide data on those issues.  Accordingly, Plaintiffs dispute all of the factual averments made by the defendants in their affidavits that are not supported by agency records or documents.  Based on what Plaintiffs know prior to discovery, it appears that attempts to find a purchaser have not been made for approximately 10 years, that rehabilitation and maintenance issues that could result in obsolescence should have been addressed by Defendants as receivers and managers of the property since 1996, and that any recent suitability analysis was cursory and based on incomplete and stale data.

## REPLY

### I.      Standing

Plaintiffs have standing to maintain this action due both to the imminent loss of their housing subsidy and to the uncertainty as to whether RHS will be the successful bidder at the November 21, 2013 foreclosure sale.  Plaintiffs' injury results from Defendants' illegal and arbitrary decision to conduct the foreclosure sale that is likely to remove their homes from the RHS Section 515 program.  Plaintiffs are entitled to postpone the sale until RHS complies with all applicable statutes, regulations and handbooks, which are intended to protect residents against rent increases and displacement if a foreclosure sale transfers Jandina to a third party.  Most of these protections have not been put in place. Plaintiffs have already suffered an injury by being

Page 2 – PLAINTIFFS' REPLY

placed in an unnecessary and uncertain position and are in imminent danger of further injury, through loss of their subsidized housing, which warrants injunctive relief.

Plaintiffs do not need to show that an injury is certain to occur. All they need to show is that they face an imminent threat of injury and that the threat is not merely hypothetical or based on conjecture. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-61 (1992). Defendants' argument that a motion for preliminary injunction in not ripe for resolution is without merit.

## II.    Agency Discretion

Plaintiffs do not concede that the agency's foreclosure decision is committed to agency discretion by law and do not believe that this issue needs to be resolved at this time. First, the Defendants' claim that they have unreviewable discretion to foreclose on loans is constrained by 42 U.S.C. § 1471(g), which requires that programs authorized under Title V of the Housing Act of 1949, including the Section 515 program, "shall be carried out, consistent with program goals and objectives, so that the involuntary displacement of families and businesses is avoided."

Second, even if the agency has unreviewable discretion to foreclose, Plaintiffs' Complaint is not restricted to the agency's actual decision to foreclose. In their first cause of action the Plaintiffs allege that the Defendants have failed to conform to a series of actions that the agency must take before actually conducting a foreclosure. (Complaint ¶ 35). This includes notification of the tenants that the agency is considering a decision to declare Jandina unsuitable for retention in the program (*Id.*, ¶ 35b); assisting the tenants in finding and relocating to other affordable housing in the community (*Id.*, ¶ 35 c); and properly and timely advising tenants of the availability to secure Letters of Priority Entitlement and Vouchers (*Id.*, ¶35 d).

In their complaint, Plaintiffs have challenged RHS's administration of the voucher

Page 3 – PLAINTIFFS' REPLY

program which is intended to assist residents displaced by foreclosure. (*Id.*, ¶ 36).  All of these claims of agency non-compliance are based on RHS policies that are set out in statutes, regulations, notices and handbooks.  They do not go to the agency's actual decision to foreclose but what the agency must do before it carries out its decision to foreclose.  Since the agency has not complied with these requirements, there is ample ground upon which to issue a preliminary injunction even if the Agency's foreclosure decision is unreviewable.

### III.    Due Process

By declaring Jandina as unsuitable for retention in the Section 515 program and by carrying out a foreclosure sale, the Defendants are violating the Plaintiffs' Constitutional and statutory due process rights.

Defendants do not dispute that the Plaintiffs have a property interest in the subsidies or in the various tenant rights that are extended to them under the Section 515 and Rental Assistance programs. These include the right to not be evicted except for good cause, the right to have a grievance hearing when any dispute arises between the resident and their landlord, the right to have various lease provisions that protect residents, and the right to participate in any rent increase decisions.  All of these rights establish a protected property interest for the Plaintiffs in their housing.  Plaintiffs will not address the termination of any of these rights except to note that the foreclosure sale will terminate all of these rights, just as it will terminate the right to receive Rental Assistance, which will be discussed next.

The right to receive Rental Assistance is a property right that is set out in 42 U.S.C. § 1490a (2)(A).  This ensures that residents receiving the assistance do not pay more than 30 percent of household income for shelter, which includes the cost of utilities.  The Defendants

Page 4 – PLAINTIFFS' REPLY

argue that Plaintiffs will not be deprived of this right because their leases will continue in place for at least 90 days, that they will be equally protected by Letters of Priority Entitlement or USDA vouchers, and that they will not be deprived of their property rights if the agency is the successful bidder at the foreclosure sale. (Defendants' Response pp. 16-17). None of these arguments are valid.

First, if a new owner purchases Jandina, the Rental Assistance subsidies currently extended to the plaintiff will terminate. RHS simply has no authority to extend Rental Assistance to developments that are not financed under Section 515 of the Housing Act of 1949. See 42 U.S.C. § 1490a (a)(2). While, the Defendants contend that the residents' leases may extend for 90 days or more after the foreclosure, at any time that their leases do expire the residents' rents will go up because the Rental Assistance will have been terminated as of the day of foreclosure. Thus, while the date of termination of assistance may vary, the foreclosure will deprive the residents of the right to continued assistance and, under both the Constitution and 42 U.S.C. § 1480(g), they are entitled to challenge that termination through an administrative process. RHS has not offered the Plaintiffs any process to have their objections to the termination of Rental Assistance heard.

Second, the Defendants suggest that the Plaintiffs' right to a USDA voucher or a LOPE substitutes for the Rental Assistance that they are currently receiving and therefore they are not deprived of a property interest. They are wrong on both counts. Assuming that vouchers are issued on a timely basis, the subsidy provided under the voucher program is not identical to the subsidy provided under the Rental Assistance program. By statute, the level of subsidy provided to a voucher holder is permanently set as the difference between the rent payment that the

Page 5 – PLAINTIFFS' REPLY

household was paying at the 515 development as of the date of foreclosure and the market value

of the unit as of the same date.  That subsidy level never changes.  Under the Rental Assistance

program, households have their incomes certified and their rent adjusted once a year or more

frequently if the household income decreases.  7 C.F.R. § 3560.152 (e).  The voucher holder does

not have these options.  Thus, the foreclosure sale will deprive the Plaintiffs of the property right

to have their shelter payment remain at 30 percent of income regardless of the household income.

Third, because the RHS voucher program is not administered locally and because

vouchers cannot be issued until after the foreclosure takes place, only 50 percent of voucher

holders are actually issued a voucher within 60-days of their eligibility for a voucher.[1]

(Declaration of Gideon Anders, ¶ 5).  Thus, there is likely to be a gap in the time that the

Plaintiffs' rental assistance is terminated and the voucher holder's subsidy commences to run.

During that period the voucher holders will have to pay market rent for the unit that they are

occupying.  Clearly, this also deprives them of the right not to pay in excess of 30 percent of

income for shelter.

Fourth, the same is true for LOPE recipients.  The number of RHS housing units in the

McMinnville is extremely limited and only 9 vacancies exist within 35 miles of the development.

(Gleason Decl. ¶ 16).  Thus, there will be a gap in time during which the Plaintiffs will have to

pay full market rent at whatever housing unit they occupy in the interim.

Fifth, both vouchers and LOPEs expire if they are not used within a limited time. LOPEs

must be used within 4 months of issuance (Declaration of Rod Hansen, p. 2), while vouchers

---

[1] RHS will only pay voucher assistance retroactively for a 60-day period once a voucher is issued.  Thus, if a
voucher holder is unable to locate a unit, negotiate with the landlord and have the landlord enter into a voucher
contract with RHS within 60 days, the voucher holder is liable for the market rent of the unit until the voucher is
issued.

Page 6 – PLAINTIFFS' REPLY

must be used within 10 months of issuance.  Defendants admit that there may be a shortage of

affordable housing in the community.  Moreover, the Plaintiffs have averred that they have had a

difficult time finding housing during searches that have extended for up to a year.  (Turner Decl.

¶ 10). Thus, if the Plaintiffs are unable to relocate to other housing within the established time

frame they lose all their subsidies.

Sixth, even if vouchers are issued timely and LOPEs allow the Plaintiffs to move to

another RHS property, the Plaintiffs will have to bear the burden and cost of relocating to other

housing.  Plaintiffs who move to private housing using a voucher will also have to pay increased

deposits, and first and last months' rent.  These are expenses that they would not have to bear if

they were allowed to remain at Jandina.

The Defendants also contend that the Plaintiffs' right to a tenant grievance procedure will

not terminate upon foreclosure because this right is set out in their leases.  This is not true.

While the right may be extended for 90 or more days, it will have terminated as of the time of the

foreclosure sale.

In support of their due process argument, the Defendants also attempt to minimize the

likelihood that Jandina will be sold to a third party at the foreclosure sale and contend that the

Plaintiffs will not be injured if RHS is not outbid at the foreclosure sale.  This is highly

questionable given that the agency is expected to bid less than $730,000 for the entire 36 unit

complex.  (Declaration of Rodney Hansen Decl. ¶20).  This equates to about $20,300 for each

unit in the complex.  Although Plaintiffs have not yet had an opportunity to conduct discovery as

to the relationship between the market value of Jandina and the RHS bid, information that the

Defendants have been unwilling to share with the Plaintiffs, this appears to be a low bar to any

Page 7 – PLAINTIFFS' REPLY

buyer in Yamhill County. Thus, the Plaintiffs believe that RHS will be outbid at the foreclosure sale.[2]

Moreover, Plaintiffs believe that even if RHS is the successful bidder at the foreclosure sale, the resident rent assistance subsidies will not continue during the time that RHS owns the property. The Rental Assistance contract for Jandina will be terminated and assistance payments will come from another source within the RHS budget.  Due to the fact that RHS has had difficulty meeting its current Rental Assistance obligations nationally, it is likely that the Rental Assistance funding will never return to Jandina.  (Anders Decl. ¶ 7).

Aside from arguing that the Plaintiffs are not being deprived of a property interest, the Defendants contend that the agency has no Constitutional or statutory due process right that extends to the Plaintiffs.  What the Defendants ignore is the fact they are part of the federal government which extends benefits to low-income residents and that as managers and financiers of Jandina they are proposing to terminate plaintiff's due process rights without any hearing or right to object to their decisions.  They contend that the Plaintiffs have already been given an opportunity to have a meeting with RHS and to air their objections.  This is not true.  The meeting took place after RHS had decided that Jandina is unsuitable for continued use in the Section 515 program and after the agency had decided to foreclose on the property.  The residents were never advised that they could raise issues with respect to either determination or that they agency would reconsider their decisions. Under any standard, the residents were not provided any semblance of due process.

---

[2] Defendants have also not disclosed whether or how many inquiries that they have received about the sale of Jandina and the quality of the potential bidders.

Page 8 – PLAINTIFFS' REPLY

Oregon Law Center
230 NE Second Ave, Suite F
Hillsboro, Oregon 97124
(503) 640-4115

The Defendants' argument that *Brewer v. Madigan,* 945 F.2d 449 (1st Cir. 1991) somehow controls this case is without foundation.  In Brewer the court decided that residents of a Section 515 development need not be provided due process prior to an eviction when the landlord must use judicial proceedings to actually displace the resident.  This is not the case here. The Defendants are not using judicial foreclosure to terminate the Plaintiffs protected rights and even if it were using such a process, they would not make the Plaintiffs parties to the proceeding.

Similarly, the recent unreported decision in  *Sheldon v. Vilsack*, No. 12-1520, 12-3905, 2013 WL 4564422 (6th Cir. Aug. 28, 2013) is also of no avail to the Defendants.  Sheldon involved a single family loan which RHS guaranteed.  RHS had no dealings whatsoever with the borrower and the Court simply held that the statutory appeals process under § 1480(g) did not extend to guaranteed single family borrowers.  Here the government manages Jandina and through its agent it has direct dealings with all of the residents.  It is terminating the residents' rights and cannot absolve itself of either the Constitutional or statutory due process obligations.

In short, all the arguments that the Defendants advance as to why the Plaintiffs' Constitutional or statutory due process rights are not violated are without foundation.

**IV.    Foreclosure at this Stage is Arbitrary and Capricious**

Defendants' claims that the Plaintiffs have "cherry picked" provisions from the RHS handbook, that Defendants have made a proper determination that Jandina is unsuitable for retention in the 515 program and that the residents have been adequately informed and protected in that process (Defendants' Response, p. 12) are simply not true.

The large majority of Chapter 6 of Handbook 3560-3, which the Defendants have attached as Exhibit B to Ms. Gleason's declaration, is devoted to instructions on making a

Page 9 – PLAINTIFFS' REPLY

determination whether a development, like Jandina, is suitable or unsuitable for retention in the Section 515 program. *See* Project Servicing Handbook 3-3560, Pages 6-1 through 6-13. RHS staff are directed to make this determination whenever the agency is considering liquidation action. (Id., ¶ 6.2). Chapter 6 of the Handbook enumerates all the steps that RHS staff needs to complete to reach an unsuitability decision, (¶ 6.2), the information it needs to collect to determine the continued need of the subject property, (¶ 6.5), the analysis that must be conducted to assess the impact on resident, (¶ 6.5 B), the decision options that are available for making an unsuitability determination, (¶ 6.7), and, in the event that an unsuitability decision is recommended, the protection that must extend to residents before finalizing that decision. *Id.* In citing and relying on provisions that are intended to protect residents from rent increases and displacement, Plaintiffs have not "cherry-picked" quotes from Chapter 6. Rather, they have pointed to numerous provisions in the Handbook that Defendants have not complied with, and Defendants have not specifically disputed this lack of compliance in any of their declarations.

The Defendants allege that Jandina has been determined to be unsuitable and obsolete. (Declaration of Rodney Hansen, ¶19). However, they have never advised the residents of their intent to so classify the development nor given information to them on the impact of the determination. To the extent that unsuitability has been mentioned to residents, it was done after the agency has already designated the development as unsuitable and had initiated the foreclosure process. (Hansen Decl., ¶14, Exhibit E to Hansen Decl.)

Most importantly, the agency never appears to have undertaken an analysis to "determine if a non-program designation would have a negative impact on tenants . . . The objective of this analysis is to determine if tenants will lose their units, suffer from rent overburden, or be unable

Page 10 – PLAINTIFFS' REPLY

to find comparable housing in the community." (Handbook, ¶ 6.3 B.1).  The agency analysis

must look to "[t]he availability of alternative housing if the proposed use of the project or

increase in rents will cause rent overburden.  The alternative housing must be comparable in size,

amenities, and rent to keep project tenants in the local community; and if the project has rental

assistance, the loan servicer must identify comparable units with rental assistance (RA) or other

rental subsidies, such as HUD Section 8."  (*Id.*)  The Handbook concludes that "the Agency

cannot remove the property from the program until the Agency finds affordable and comparable

housing for all the tenants."  (*Id.*, ¶ 6.5 C 3; *see also* ¶ 6.9). The Defendants have simply not

complied with any of these requirements and it would be too late for them to do so after the

property is sold to a third party.

Providing Letters of Priority Entitlement (LOPEs) to 36 residents after foreclosure will

flood a market that already has few alternative affordable housing units. LOPEs should have

been issued when RHS first considered foreclosing on the property in 2009, or earlier, so that 36

households could have ample time to relocate to other housing. Similarly, the residents should

have been allowed to apply for vouchers prior to the foreclosure so that they could begin looking

for alternative housing the day after the foreclosure and not some 30 days after they receive

notice that they may apply for a voucher.

While the RHS handbooks do not have the force and effect of law as regulations, they

clearly enunciate agency policy implementing the anti-displacement provisions contained in 42

U.S.C. §1471 (g).  Hence, as the Ninth Circuit Court of Appeals has stated, the Agency is not

free to ignore the mandates that are set out in the handbooks without some further justification,

which the agency has not provided. *Barrientos et al., v. Morton LLC*, 583 F.3d 1197, 1214 (9th

Page 11 – PLAINTIFFS' REPLY

Cir. 2009).  In light of the fact that RHS has operated Jandina for nearly 17 years, that, in all likelihood the development's physical condition has deteriorated while Jandina has been under its management, and that the economic viability of the development, which is fully occupied, has also deteriorated under the agency's receivership, the agency cannot justify why it is unable to postpone the foreclosure sale until a comprehensive review is conducted as to the feasibility of maintaining the development as affordable housing and, if that is not a viable alternative, the residents are assured continued safe and affordable housing in the McMinnville community.

Defendants' reliance on *Albany Apartments Tenants' Ass'n v. Veneman*, No. 01-cv-1976, 2003 WL 1571576 (D. Minn. March 11, 2003) is misplaced.  The plaintiffs in *Albany Apartments* sought to set aside the sale of an RHS Section 515 development based on argument that the Section 1471(g) precluded future displacement of any residents.  *Id*. at 11.  This is not the Plaintiffs' claim in this case.  Plaintiffs do not argue that RHS cannot displace residents if the preservation of Jandina is unfeasible.  They are arguing, however, that the resident protections set out in RHS Handbook 3-3560 Chapter 6, must be followed if any displacement does take place.  These protections were simply not at issue in *Albany Apartments*.  *See id*.

## V.    Balance of Hardships

Defendants' contention that the balance of hardship tips in favor of Defendants is not supportable.  For most tenants of Jandina, including Plaintiffs, moving forward with the foreclosure sale without complying with program protections is likely to result in imminent harm including loss of tenant right protections, displacement, higher rents, moving costs, inability to maintain stable housing, loss of housing, compromise of their custodial rights, and potential homelessness.  Defendants' maintain that their sole harm is the approximately $7,000 per month

Page 12 – PLAINTIFFS' REPLY

it is costing them to maintain decent affordable housing for the 36 families living at Jandina. (Gleason Decl., ¶ 12).  The only other identified harm to Defendant appears to be an aversion to an unexplained risk that compliance could result in unjust enrichment of the unresponsive and defaulted borrower.  (Hansen Decl., ¶ 12).  Given that the agency has incurred a monthly loss for over three years (Hansen Decl., ¶ 7), It is not reasonable for Defendants to continue to incur this cost until they determine whether it is feasible to preserve Jandina and, if it is not, until it can help the plaintiffs and other residents find other decent and affordable housing.  The hardships to the tenants clearly outweigh those of the agency.

### VI.    Public Interest

The purpose of the Section 515 program is to provide affordable housing.  RD is statutorily tasked with maintaining affordable housing without causing involuntary displacement of families.  42 U.S.C. § 1471(g).  Moving forward with foreclosure of Jandina without following handbook guidelines is very likely to result in the loss of 36 units of affordable housing in a community that already has a shortage of safe, decent and affordable housing.  Moreover, it will result in extreme hardships to the very persons that the Section 515 program is intended to assist.  It can hardly be in the public interest to displace low income residents without any assistance in order to save the government $7,000 in purported management fees.

/ / /

/ / /

/ / /

/ / /

/ /

Page 13 – PLAINTIFFS' REPLY

## CONCLUSION

For the foregoing reasons and those set forth in Plaintiffs' Memorandum in Support of a

Preliminary Injunction, the Court should grant Plaintiffs' motion for a preliminary injunction.


DATED this 12th day of November, 2013.


OREGON LAW CENTER


By:    /s/Michael Pijanowski
       Michael Pijanowski, OSB #004462
       Phone: (503) 640-4115
       Fax: (503) 640-9634
       mpijanowski@oregonlawcenter.org
       Of Attorneys for Plaintiffs

Page 14 – PLAINTIFFS' REPLY