IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **TRINKA A. TURNER**, *et al.*, | Case No. 3:13-cv-1900 SI |
| Plaintiffs, | |
| v. | **OPINION AND ORDER** |
| **THOMAS VILSACK**, *et al.*, | |
| Defendants. | |

Michael Pijanowski, Leslea Smith, Spencer Neal, Edward Johnson, Oregon Law Center, 230 N.E. Second Avenue, Suite F, Hillsboro, OR 97124. Attorneys for Plaintiffs.

S. Amanda Marshall, United States Attorney, Sean E. Martin, Assistant United States Attorney, 1000 S.W. Third Avenue, Suite 600, Portland, OR 97204. Attorneys for Defendants.

**Michael H. Simon, District Judge.**

This matter is before the Court on Plaintiffs' Motion for Preliminary Injunction (Dkt. 6). Plaintiffs request that the Court preliminarily enjoin Defendants, officials with the United States Department of Agriculture ("USDA") and its Rural Development ("RD") and Rural Housing Service, from proceeding with the foreclosure sale of Jandina Park Apartments ("Jandina"), where Plaintiffs reside. For the reasons stated below, Plaintiffs' motion is granted.

PAGE 1 – OPINION AND ORDER

## STANDARDS

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council,* 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. *Winter,* 555 U.S. at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's alternative "serious questions" test. *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132 (quotation marks omitted). Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus,* 697 F.3d 706, 725 (9th Cir. 2012) (citing *Cottrell*).

## BACKGROUND

Plaintiffs are low-income tenants in Jandina, a 36-unit apartment building that is part of the USDA's RD housing portfolio. Through the RD program, Plaintiffs receive subsidies that enable Plaintiffs to pay no more than 30 percent of their income for rent and utilities. These subsidies may be transferred (or "ported") to another RD housing project, if there are available vacant units. Vacancies in such units vary as persons move in and out, but as of November 7,

2013, there were approximately nine available units within 35 miles of Jandina. There are 24 units in Jandina that receive rental assistance subsidies.

Plaintiffs cannot afford to pay market rent at Jandina or elsewhere. Plaintiffs also cannot afford to pay moving costs to relocate. If Jandina is sold at foreclosure to anyone other than the USDA, Plaintiffs face the threat of homelessness. Plaintiff Trinka Turner also faces the threat of losing custody of her two children, because she was previously denied custody for not having stable housing and was then granted custody only after moving into Jandina.

Through the RD program the USDA loans money on favorable terms for the development of low-income housing. In these circumstances, the USDA acts generally only as the lender. With Jandina, however, the USDA has a more substantive role. In 1989, the USDA loaned money for the development and operation of Jandina as low-income housing. In 1996, the USDA was appointed as the receiver of Jandina, and continues to serve in that capacity. In its role as receiver, the USDA is the day-to-day manager of Jandina, through a management company retained by the USDA. Thus, the USDA is, and has been since 1996, ultimately responsible for the physical condition of Jandina.

In 2009, the USDA accelerated its loan to the developer of Jandina and notified the tenants of Jandina that the USDA was planning to liquidate its interest in the property. In April 2013, the USDA formally recorded an updated notice of acceleration and set a nonjudicial foreclosure for September 2013. The foreclosure sale was later moved to November 21, 2013. The USDA sent notification letters to the tenants of Jandina regarding the pending foreclosure sale. In early September 2013, Agency representatives held a meeting with the tenants to provide information regarding the foreclosure sale and the tenants' rights after foreclosure. On October 24, 2013, Plaintiffs filed the Complaint in this action, seeking an injunction and alleging that

Defendants' conduct violated the Administrative Procedure Act ("APA") and the Due Process Clause of the United States Constitution. On October 31, 2013, Plaintiffs filed the pending motion for a preliminary injunction. The Court held a hearing on the motion on November 14, 2013.

## DISCUSSION

The Court finds that Plaintiffs meet their burden of showing that there are serious questions going to the merits of their claims, the balance of the equities tip sharply in their favor, they are likely to suffer irreparable harm, and the injunction is in the public interest.

### A.  Serious Questions Going to the Merits of Plaintiffs' Claims

#### 1.  APA Claim

Plaintiffs allege that the USDA's actions in finding Jandina unsuitable to stay within the RD program and proceeding with a foreclosure sale violated the APA. "Under the APA, [a court] may set aside an agency decision if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Earth Island Institute v. U.S. Forest Serv.*, 697 F.3d 1010, 1013 (9th Cir. 2012) (alterations in original) (quoting *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1238 (9th Cir. 2005)). Plaintiffs rely heavily on the procedures outlined in the USDA's Project Servicing Handbook ("Handbook") to support the allegation that the USDA's actions violated the APA.

An agency handbook not promulgated in accordance with the procedural requirements of the APA is not binding authority, and failure to follow such a handbook's procedures does not automatically result in a violation of the APA. *See Western Radio Servs. Co., v. Espy*, 79 F.3d 896, 901-01 (9th Cir. 1996). Such handbooks are, however, persuasive authority as to the proper procedures an agency should follow. *See, e.g., Jacinto v. I.N.S.*, 208 F.3d 725, 733 n.5 (9th Cir. 2000) ("Although not binding, the UNHCR Handbook provides persuasive authority for courts

determining what procedures are appropriate for conducting asylum hearings."); *Kennedy v. World Alliance Finan. Corp.*, 792 F. Supp. 2d 1103, 1108 (E.D. Cal. 2011) (holding that "while HUD's handbooks do not have the force of law in the instant case, they are entitled to persuasive authority as general statements of agency practice and procedure"); *accord Balvage v. Ryderwood Improvement and Serv. Assoc.*, 642 F.3d 765, 775 (9th Cir. 2011) (agency publications adopting a reasonable interpretation of agency regulations are entitled to deference). Accordingly, the Court considers the requirements and procedures of the Handbook in determining whether there are serious questions as to whether the USDA's actions were arbitrary, capricious, or an abuse of discretion.

The Handbook requires that before a property in the RD program may be liquidated, the USDA must conduct a suitability analysis. Handbook § 6.1. Dkt. 10-2. As relevant here, the suitability analysis requires that the USDA determine if there is a need for the project and if the project is obsolete.

### a. Need

In determining need, the Handbook instructs that significant information should be gathered, including a market study, local employment and economic trends, possible rents if the project becomes "non-program," and community input to ascertain the community's desire to retain the project. *Id.* § 6.5(A). The Handbook instructs the USDA to consider tenants' ability to stay in the project and the availability of alternative housing with rental assistance. *Id.* § 6.5(B)(1). The Handbook next instructs the USDA to determine if the project is economically viable by considering market demand, whether the budget, rent, and marketing plans are adequate, whether any special servicing options would be appropriate, whether local economic conditions will significantly improve in the next one to two years, and whether the property will be able to pay essential expenses. *Id.* § 6.5(B)(2).

PAGE 5 – OPINION AND ORDER

There is a need for the project if the loss of the project will have an adverse impact on its tenants and the project is economically viable. *Id.* § 6.5(C)(1). Here, the USDA determined that there *was* a need for the project. Declaration of Rodney L. Hansen ("Hansen Decl.") ¶ 19. Although the USDA did not characterize its finding under the Handbook, a finding that there is a need for a project comes under § 6.5(C)(1). But the USDA also concluded that the project was not economically viable because the cost to repair it would exceed the cost to build a new facility. Hansen Decl. ¶ 19. Thus, the USDA's conclusion appears to more accurately come under § 6.5(C)(3) of the Handbook. That clause provides that a project is deemed "not needed" if the property is not economically viable, even if its loss would have an adverse impact on the tenants. In these circumstances, the Handbook instructs that the property cannot be "removed" until the USDA finds affordable housing for all of the tenants.

### b. Obsolescence

To determine obsolescence, the Handbook instructs the USDA to perform information gathering, including a unit-by-unit physical inspection with a cost estimate for any needed repairs, a market study, and an estimate of the feasibility and cost of needed repairs. Handbook § 6.6(A). The Handbook further instructs that there are three reasons a property may be considered obsolete: (1) it poses a health or safety risk to tenants; (2) it has structural or design characteristics that make it economically unviable; or (3) the site is no longer economically viable because of local economic conditions. *Id.* § 6.6(B). In order to declare a property obsolete, the Handbook instructs that the USDA must document that the condition that it finds does exist and must find that: (1) the condition cannot be resolved through special servicing, a workout agreement, or a subsequent loan; (2) the total cost to resolve the issue is greater than the cost of building a new project; or (3) the size of the rehabilitation financing makes the project economically unviable. *Id.* § 6.6(C).

PAGE 6 – OPINION AND ORDER

With regard to Jandina's obsolescence, the USDA concluded that the property "suffers from excessive physical obsolescence that cannot be corrected through special servicing . . . . [and] that the cost to resolve the excessive physical obsolescence exceeds the cost of building a new project." Hansen Decl. ¶ 19. "Special servicing" options are detailed in Chapter 10 of the Handbook, and include changing rents, increasing rental assistance, changing management, providing temporary incentives, performing maintenance, improving curb appeal, marketing, budgeting, outreach, and security, cutting costs, or injecting non-project revenue. Handbook §§ 10.13, 10.25, available at http://www.rurdev.usda.gov/Handbooks.html.[1]

If the USDA determines that there is no need for the project or the project is obsolete, the USDA should then prepare a case file with all the documentation from the suitability analysis and a recommendation, and forward that file to the RD office in the state in which the project is located ("State Office"). *Id*. § 6.7. The USDA should then notify tenants that the USDA is reviewing the project's suitability, hold a meeting discussing the implications of that review, and provide additional notification and meetings when the USDA makes a final determination. *Id*. Meanwhile, the State Office should consider how the factors of need and obsolescence influence the final decision of suitability. If the USDA determines that a project is no longer suitable, it can designate the property as a non-program property or it can pursue a different course of action. *Id*. § 6.7(B). Here, the USDA concluded that the property was no longer suitable and is pursuing foreclosure as its "different course of action" after the conclusion of the suitability analysis.

The Court finds that serious questions are raised as to whether the suitability analysis performed by the USDA was arbitrary, capricious, or an abuse of discretion. There is no

---

[1] Although Mr. Hansen's declaration mentioned "special servicing," Chapter 10 of the Handbook was not placed into the record by either party. The Court takes judicial notice of the entire Handbook.

evidence before the Court that there was adequate information gathering, analysis, documentation, or notice to the tenants throughout the suitability analysis. Although Mr. Hansen testified that he performed a suitability analysis in compliance with the Handbook, no information was provided to the Court as to how the analysis was performed or what information was gathered and relied upon by the USDA in reaching its conclusions.

There are also serious questions raised as to whether the property is physically obsolete such that repairs would cost more than building a new project. Plaintiffs testified by declaration as to the generally good physical condition of their units, and there is no specific evidence before the Court of major physical issues or estimates of repair indicating that costs of repair exceeds the cost of the construction of a new 36-unit complex.[2] Further, the USDA's conclusion that the property is no longer suitable because of "excessive physical obsolescence" is unclear, given that the USDA took over management of the property when it was only approximately six years old and the USDA, or its agent, managed Jandina thereafter. Thus, any "excessive physical obsolescence" would appear to have been caused by the USDA's management and the USDA is now relying on a condition that it possibly caused to justify a suitability conclusion and foreclosure sale. *Cf. Clifford by Clifford v. U.S.*, 738 F.2d 977, 980 (8th Cir. 1984) (refusing to adopt a rule regarding when the statute of limitations begins to accrue proffered by the government because "under it the government would profit from its own (alleged) wrong.").

Additionally, it appears that the USDA likely made a determination that loss of the project will adversely affect the tenants but that it is not economically viable. Pursuant to

---

[2] Mr. Hansen testified by declaration that the USDA "believes" that repair costs will exceed the cost of building a new project, but he does not provide any information as to why he holds that belief.

PAGE 8 – OPINION AND ORDER

Handbook § 6.5(C)(3), when these two determinations are made, the USDA should find suitable housing for all subsidized tenants before the property is removed from the program.

### 2. Due Process Claim

To succeed on their claim of a due process violation, Plaintiffs must show that they did not receive adequate notice or a meaningful opportunity to be heard. *Ludwig v. Astrue* , 681 F.3d 1047, 1053 (9th Cir. 2012) ("Notice and [a meaningful opportunity] to be heard are the hallmarks of procedural due process.") (alteration in original) (quotation marks and citation omitted).

Whether Plaintiffs raise serious questions going to the merits of their due process claim is a closer question. The Court finds that Plaintiffs received adequate notice of the foreclosure. The Court also finds, however, that serious questions have been raised as to whether Plaintiffs received adequate notice of the suitability determination and whether Plaintiffs had a meaningful opportunity to be heard regarding the suitability determination and the foreclosure. The meeting that was held in September 2013 appears to have been a meeting in which information was passed on to Plaintiffs regarding the effect of the pending foreclosure and not one where Plaintiffs had a meaningful opportunity to be heard. It also does not appear that any meetings were held regarding suitability analysis, as described in the Handbook.

Plaintiffs also cite to 42 U.S.C. 1480(g) as providing them with a due process right to appeal the USDA's decision. A recent unpublished decision by the U.S. Court of Appeals for the Sixth Circuit held that for borrowers there is no due process right to appeal the decisions of private lenders under § 1480(g), relying on the regulations propounded by the USDA that expressly exclude appeals of certain lender decisions. *Sheldon v. Vilsack*, 2013 WL 4564422 (6th Cir. Aug. 28, 2013). *Sheldon* is not binding on this Court, and there are questions as to whether the reasoning of *Sheldon* even applies to the facts of this case, which do not involve borrowers or

PAGE 9 – OPINION AND ORDER

the decision of a private lender. Further, the First Circuit has held that § 1480(g) "imposes two specific conditions on the rulemaking powers conferred upon the Secretary. Tenants of [RHS] subsidized housing whose assistance is altered to their detriment *must* be given, first, written notice of the adverse decision and, second, at least an opportunity to appeal and present additional information to a person, other than the original decisionmaker, with the authority to reverse the decision." *Brewer v. Madigan*, 945 F.2d 449, 453 (1st Cir. 1991) (emphasis added). Thus, on balance, serious questions are raised as to the merits of Plaintiffs' due process claim.

## B.  Balancing the Equities

Defendants argue that the balance of equities tip in their favor because the United States government is losing approximately $7,000 per month. The Court finds that the threat of homelessness and the threat of losing custody of one's children outweighs the USDA's loss of $7,000 per month. Additionally, the Court is moving expeditiously to trial. Thus, if Defendants prevail at trial, the granting of the injunction will only have resulted in a delay of a few months. Therefore, the balance of the equities tips sharply in Plaintiffs' favor.

## C.  Likelihood of Irreparable Harm

The threat of eviction from subsidized housing and a demonstrated inability to pay market rates and moving costs constitute irreparable harm. *See Park Village Apt. Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1159 (9th Cir. 2011) (finding that "the individual Plaintiffs were likely to suffer irreparable harm absent preliminary relief because they faced eviction from their [subsidized] rental units" and demonstrated an inability to pay market rates); *see also Smith v. State Farm*, 737 F. Supp. 2d 702,714 (E.D. Mich. 2010) (holding that "in certain circumstances, the threat of eviction and the realistic prospect of homelessness constitute a threat of irreparable harm and satisfy the first prong of the test for preliminary injunctive relief"). Here, Plaintiffs face the threat of eviction from their subsidized housing if the USDA

PAGE 10 – OPINION AND ORDER

does not purchase the property at the foreclosure sale, and Plaintiffs have demonstrated that they cannot pay market rents or moving costs. Defendants argue that there are other units available with rental assistance, but there are only nine units available within 35 miles of Jandina and there are 24 units at Jandina receiving rental assistance. Defendants argue that moving more than 35 miles for subsidized housing is a "mere inconvenience," relying on *Brown v. U.S.D.A.*, 2006 WL 2644925, at *3 (M.D. Fla. Sept. 14, 2006). The Court is not convinced that forcing Jandina tenants to move far away from their families, friends, communities, places of worship, medical providers, and jobs in order to retain their subsidized housing constitutes a mere inconvenience. Additionally, in *Brown*, the USDA offered to pay moving expenses—here the USDA has not made such an offer. Moving farther away is a more expensive proposition than moving close by, and Plaintiffs have demonstrated that they cannot afford moving expenses.

Defendants also argue that the harm to Plaintiff is unlikely because the USDA might prevail in purchasing Jandina at the foreclosure sale. Defendants admitted at oral argument, however, that the USDA decided not to take a deed in lieu of foreclosure (which is authorized under 7 C.F.R. § 3560.456, and Handbook § 12.2(B)(1) instructs that it is generally a preferable option to foreclosure) because the USDA will obtain a greater recovery from a foreclosure sale. Defendants admitted that the USDA prefers getting its loan paid at a foreclosure sale than taking a deed in lieu of foreclosure. This admission indicates that there is a significant risk that the USDA will not purchase Jandina at foreclosure.

Further, Defendants testified, and reiterated at oral argument, that the USDA has had the property appraised or otherwise valued. This information is in Defendant's custody or control but has not been provided to the Court (or to Plaintiffs). Because Defendants did not provide the market valuation of Jandina to the Court, the Court takes the adverse inference that this evidence

would show that the USDA's intended bid for Jandina is below market value and thus the evidence would not support Defendants' position that the USDA will likely prevail at the foreclosure sale.

Based on the evidence before the Court regarding Defendants' decision not to pursue a deed in lieu of foreclosure and the adverse inference the Court draws from Defendant's decision not to provide the Court with the market valuation, the Court finds that it is likely that the USDA will not purchase Jandina at the foreclosure sale. Therefore, it is likely that Plaintiffs will suffer irreparable injury if the foreclosure sale proceeds as scheduled.

## D.  Public Interest

The USDA is directed to provide loans to "provide rental or cooperative housing and related facilities for persons and families of low income in multifamily housing projects . . . ." 42 U.S.C. § 1490a. This program, among others, was instituted because Congress found that the nation was not meeting the national goal of "the realization as soon as feasible of the goal of a decent home and a suitable living environment for every American family." 42 U.S.C. § 1441a(a) (quotation marks omitted). Congress further found that under earlier policies designed to achieve the national housing goal, "the deterioration and abandonment of housing for the Nation's lower income families has accelerated . . . ." § 1441a(b). The purpose of the RD programs are "to provide economically designed and constructed rural rental, cooperative, and farm labor housing and related facilities operated and managed in an affordable, decent, safe, and sanitary manner." 7.C.F.R. §§ 3560.1(b). The programs are to be carried out so that the involuntary displacement of families is avoided. 42 U.S.C. § 1471(g).

There is a strong public interest in ensuring the RD program is properly carried out to meet the purposes and goals of these statutes and regulations, *to wit*, aiding low-income persons and families to obtain and remain in affordable, safe, and sanitary housing. *See Park Village*, 636

PAGE 12 – OPINION AND ORDER

F.3d at 1159-60; *Jones v. Upland Housing Authority*, 2013 WL 708540, at *16 (C.D. Cal. Feb. 21, 2013); *Miller v. Vilsack*, 2011 WL 5516979, at *3 (W.D. Mich. Nov. 9, 2011). Further, there is a strong public interest in ensuring agencies comply with their statutes and regulations and do not act arbitrarily or capriciously.

Defendants argue that allowing an injunction in this case is not in the public interest because it will make it more difficult for the USDA to foreclose on properties than for borrowers on such properties to prepay their mortgages, and that both of these have the same effect—displacement of tenants. By granting this preliminary injunction, however, the Court is not finding that the USDA cannot foreclose but only that there are serious questions as to whether the USDA has engaged in adequate information gathering and analyses before making the decision to foreclose. The Court is merely ensuring that the USDA has a basis for its decision such that the decision is not arbitrary, capricious, or an abuse of discretion. Notably, the binding regulations governing prepayment procedures require extensive information gathering and analyses by the USDA, and in many circumstances instruct the USDA to deny prepayment or require use restrictions on the property before allowing prepayment, particularly if there is not an adequate supply of affordable, safe, and sanitary housing in the community where the property is located. *See* 7 C.F.R. §§ 3560.651- 3560.700. Although the Court is sensitive to the USDA having the ability to foreclose on delinquent program properties, the Court is not persuaded that its concerns regarding the information gathering and analyses conducted by the USDA render the USDA's ability to foreclose more difficult than its ability to approve prepayment.

## E.  Bond

Federal Rule of Civil Procedure 65 instructs that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have

been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Federal courts, however, have discretion as to the amount of security and may even dispense with the security requirement altogether. *See Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) ("'Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*.'" (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003))); *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005) ("'The district court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review.'" (quoting *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985))).

Plaintiffs request that no bond be required in this case. Although Defendants oppose Plaintiffs' Motion for a Preliminary Injunction, Defendants did not object to Plaintiffs' request that the bond be waived if such an injunction were allowed. The Court has considered the relative hardships, the likelihood of success on the merits, and Plaintiffs' financial resources and concludes that to require any security in this case would effectively deny Plaintiffs access to judicial review.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction (Dkt. 6) is GRANTED. Defendants and the USDA are preliminarily enjoined from conducting a foreclosure sale of Jandina and it is hereby ordered that the foreclosure sale scheduled for November 21, 2013 be cancelled. The Court waives the requirement of a bond.

**IT IS SO ORDERED**.

DATED this 18th day of November 2013.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge

PAGE 14 – OPINION AND ORDER